# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| Akanthos Capital Management, LLC, *et al.*, | ) | |
| Plaintiffs, | ) | **Civil Action File** |
| | ) | |
| vs. | ) | **Number 1:10-CV-844-TCB** |
| | ) | |
| | ) | |
| CompuCredit Holdings Corporation, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

ARNALL GOLDEN GREGORY LLP
171 17th Street, N.W., Suite 2100
Atlanta, Georgia 30363-1031
Telephone: (404) 873-8654
Facsimile: (404) 873-8655

ROSS & ORENSTEIN LLC
222 South Ninth Street, Suite 470
Minneapolis, MN 55402
Telephone: (612) 436-9801
Facsimile: (612) 436-9819

*Attorneys for Plaintiffs*

## INTRODUCTION

*I'll tell you what I'm thinking. I think it smells.  I'm not sure it stinks.*
*But what they're doing to this company, I don't like it.*[1]
> Hon. Timothy C. Batten

As the Court is aware, this case involves repeated acts of self-dealing by the officers and directors of CompuCredit Holdings Corporation ("CompuCredit" or the "Company") to the detriment of the Company's creditors.  The latest step, which prompts this motion for a preliminary injunction, is management's announcement of an $8 per share tender offer ("Tender Offer") which would deplete $105 million from CompuCredit to enrich its insiders at the expense of its noteholders—many of whom are Plaintiffs ("Noteholders").  Under recent Georgia Supreme Court authority, proof of CompuCredit's intent to defraud creditors, standing alone, is sufficient grounds to enjoin the Tender Offer.  *Bishop v. Patton*, --- S.E.2d ---, 2011 WL 680197 (Ga. Feb. 28, 2011).  The proposed Tender Offer also will render CompuCredit insolvent, or imminently so, and therefore constructive fraud is an alternative basis for granting equitable relief under the Uniform Fraudulent Transfer Act, O.C.G.A §18-2-71 *et seq.* ("UFTA").

When the parties last appeared, the Court expressed "misgivings about the conduct of the Hannas" and "concerns about whether or not they are stripping the Company of its assets to the detriment of these Plantiff creditors."  (Ex. 1 at 47:9-

---

[1] May 12, 2010 Tr. at 10:16-18 (Ex. 1).  All Exhibits cited herein at "Ex. __" are attached to the March 23, 2011 Declaration of Harry Niska.

1

13.)  Defendants were warned that they were "on notice" of Noteholders' claims and "if they proceed with these actions, they do so at their peril."  (*Id.* at 47:20-23.) The Court made it "unmistakably clear that the Defendants, including the officers and directors, are obviously on notice that their conduct, their actions, are going to be carefully scrutinized" and "emphasize[d]" that its denial of Plaintiffs' preliminary injunction motion at that time "should not be regarded as an indictment of the Plaintiffs' claim" and stated that "there's going to be a whole lot of scrutiny and eyeballs on these Defendants … to see what they do from this point forward."  (*Id.* at 50:17 – 51:5.)

Apparently these admonitions fell on deaf ears because on March 14, 2011, CompuCredit announced yet another $105 million give-away to its shareholders in the form of the $8 per share Tender Offer.  The inappropriately high offering price is irreconcilable with CompuCredit's finances which are at an all time nadir, with ongoing losses, and with substantial obligations to Noteholders and other creditors coming due.  Moreover, the Tender Offer is just the latest in what the Court already has recognized as an "ongoing course of conduct," which Plaintiffs allege is probative of an actual intent to "hinder … or defraud" Noteholders.  (Doc. 152, March 15, 2011 Order ("Order") at 26, 34-35.)[2]

---

[2] Not surprisingly, upon announcement of the Tender Offer, CompuCredit shares traded up from $6.27 per share on extremely heavy volume to an inter-day high of $7.20 per share.  Later that

One year ago Noteholders asked this Court to enjoin part of CompuCredit's proposed Dutch auction that was intended to coerce Noteholder sales at unfairly low prices. The Court declined to issue the temporary injunction, and immediately thereafter, CompuCredit paid $85,264,230 to tendering shareholders. (Ex. 2.) Since then, CompuCredit's finances have substantially worsened. In less than a year its equity has declined by two-thirds from $195.2 million as of March 31, 2010 (Ex. 3 at 1) to $61.8 million as of December 31, 2010 (the last report available) (Ex. 4 at F-2). If the Tender Offer occurs, CompuCredit will be left with just $21.57 million of equity, one-ninth of its capital from a year ago, and an unreasonably small amount relative to its remaining obligations. (March 23, 2011 Declaration of Ed McDonough ("McDonough Decl."), ¶ 12; *id.*, Ex. B at 1-2, 10.) In fact, ***if CompuCredit proceeds with the Tender Offer and continues to lose money at its average quarterly rate of loss in 2010***, ***it will likely be insolvent as of the end of the first quarter of this year.*** (*Id.*)[3]

Furthermore, since last year the law of this case has clarified. The Order acknowledges that Noteholders' claims are viable, and the Tender Offer is the latest and also largest example of Defendants' self-dealing that demonstrates their

---

day, the Order was filed and shares fell to close at $6.93. Conversely, CompuCredit's 3.625% Notes traded down from $930 to $910 and its 5.875% Notes traded down from $550 to $525.

[3] Noteholders do not possess first quarter results for CompuCredit. Even if the Company operates more profitably this quarter, its insolvency is imminent because its business is shrinking, the subprime market will not foreseeably bounce back, and the Company is liquidating.

ongoing intent to hinder or defraud Noteholders.  As the Georgia Supreme Court decided only last month in *Bishop v. Patton*, Defendants' intent to defraud is highly relevant to the question of whether to impose injunctive relief in favor of creditors under the UFTA.  Indeed, once proof of Defendants' fraudulent intent is established, "[t]he fact that the alleged fraudulent transfer did not leave the defendant absolutely penniless is insufficient to defeat an interlocutory injunction." *Bishop*, 2011 WL 680197, at *11.   All of these new developments mandate enjoining the Tender Offer.

## FACTUAL BACKGROUND

Because the Court is familiar with the factual background, this memorandum will focus on recent events leading up to the proposed Tender Offer.

### 1. In 2010 CompuCredit's business deteriorated substantially as reflected by year-end financial statements.

Since last year CompuCredit's financial situation has deteriorated dramatically.  One year ago, CompuCredit's equity stood at $195.2 million.  (Ex. 3.)  Due to ongoing operational losses CompuCredit's equity decreased by more than two-thirds over the next nine months to end 2010 at $61.8 million. (Ex. 4 at F-2.)[4]

---

[4]  In 2010 CompuCredit purchased $84.6 million face of the Notes at a discount which resulted in a balance sheet gain of $24.2 million.  (Ex. 4 at F-40).  But for these purchases, CCRT's equity would have dwindled to $37.6 million as of December 31, 2010.  Moreover, CompuCredit saw a significant one-time increase in interest income from year end 2009 to 2010 due solely to a change in accounting rule.  (McDonough Decl., Ex. B at 5.)

CompuCredit's current and future financial prospects are dubious. The Company is highly dependent upon outside financing but none is currently available; CompuCredit is unable to raise cash by issuing additional debt or equity or by selling its receivables interests. (*Id.* at 21.) As such the Company "continue[s] to operate under liquidity constraints." (*Id.*) CompuCredit is "unable to predict when or if" liquidity markets will improve. (*Id.* at 61.)

Therefore, "[CompuCredit's] business currently is contracting" and it has "substantially eliminated its marketing efforts." (*Id.* at 22.)    In short, all of the quantitative and qualitative metrics from a year ago are now much worse. Thus, the Company is liquidating because its future is bleak.

In 2010, CompuCredit lost $114.21 million from operations, or, on average, $28,553,000 per quarter. (McDonough Decl., Ex. B at Table 2, Table 4.). There is no reasonable basis from which to infer that its business prospects in 2011 will improve. (McDonough Decl., Ex. B at 4-7, 9-10.)

## 2. On December 31, 2010 CompuCredit's announced the sale of the United Kingdom Microloan business.

Fifteen months ago, when CompuCredit first declared its intent to siphon away corporate assets, one proposal entailed the spinoff of Purpose Financial Holdings, Inc. ("PFH") to shareholders. The Court accurately described the transaction in the context of Plaintiffs' allegations:

CompuCredit also announced in November 2009 its intention to spin off [PFH], the microloan segment of its business. Plaintiffs contend that the microloan segment is currently CompuCredit's only profitable business and that like the dividend, the spin-off will primarily benefit corporate insiders such as the Hanna brothers. Plaintiffs allege that CompuCredit has also filed a detailed Form 10 statement reflecting the proposed terms of the spin off. That statement shows that current shareholders—again, primarily corporate insiders—will receive a ratable portion of the shares of the spun-off microloan subsidiary, meaning that the corporate insiders will own a majority of the shares of the subsidiary. The result of the PFH spin-off, Plaintiffs allege, will be the transfer of more than $140 million in equity away from CompuCredit, leaving the company with only deteriorating assets against which lenders will not lend credit.

(Order at 4-5.)

Had CompuCredit spun off PFH in 2010 simultaneously with the coercive Dutch tender offer, it would have rendered CompuCredit insolvent immediately. (Doc. 96-2 at 13.) What CompuCredit could not do in 2010 it is trying to do now.

CompuCredit did not spin off PFH in 2010 but now is proposing essentially the same transaction in a different two-part disguise. CompuCredit has announced the sale of the United Kingdom microloan business, Month End Money ("MEM"), which appears to comprise essentially the same assets as PFH. (Ex. 5.)[5]

---

[5] Apparently MEM was a substantial part, if not all of the United Kingdom operations of PFH, which was meant to be spun off for the sole benefit of CompuCredit's shareholders. (Ex. 4 at 1 (describing PFH as "our U.S. and U.K. micro-loan businesses"); Ex. 6 at 9 (noting that the PFH spin-off "would likely occur only if the MEM Sale Transaction does not close").) The precise relationship will be the subject of further discovery.

The third-party sale of MEM will bring cash into CompuCredit and ostensibly should have been good news to the Noteholders.  The December 31, 2010 announcement disclosed that the sale would net $160 million cash to CompuCredit before taxes, meaning that the Company would have substantially more cash and assets on its books to pay off Noteholders and other creditors.  (Ex. 5.)  This would have been particularly timely given CompuCredit's horrendous 2010 losses and anticipated future losses.  Unfortunately, the good news was not to be.

### 3.  CompuCredit announces the $8 Tender Offer.

The sale of MEM is scheduled to close in April 2011.  With that in mind, the Company waited until March 14, 2011 to announce a tender offer for 13,125,000 of its shares at $8 per share, set to expire on April 11, 2011.  In other words, cash coming in from the sale of MEM would be paid out immediately to shareholders.  (Ex. 6 at 10.)  Indeed, the Tender Offer is contingent upon CompuCredit's "receipt of proceeds from the closing of the MEM Sale Transaction, which proceeds are necessary to fund the Purchase Price for the Shares."  (Ex. 6 at 10.)  Thus, CompuCredit is now attempting to accomplish in two steps what it had threatened fifteen months ago by spinning off PFH to shareholders.  And just as spinning off PFH in 2010 would have rendered CompuCredit insolvent at that time, by selling

MEM and cashing out shareholders Defendants are rendering the Company insolvent now. (McDonough Decl., Ex. B at 1-2, 9-10.)

If all shares tendered, then $105 million in cash would be leaving the Company (13,125,000 X $8 = $105,000,000).[6] (Ex. 6 at 10.) The Hanna brothers and other insiders have disclosed their intent to participate to the fullest extent possible—the owners are fleeing for the exits. (Ex. 6 at 20.) By themselves, the Hanna brothers currently own more than 50% of CompuCredit; altogether insiders holding approximately 59.1% of CompuCredit shares intend to tender shares. (Ex. 6 at 20.) Thus, as with previous shareholder giveaways, insiders, many of whom are Defendants here, stand to gain the most. Indeed, over $62 million is set to go to CompuCredit's insiders.

### 4. Compucredit cannot meet its obligations to repay the 3.625% Noteholders in May 2012.

In March 2010, $230 Million in 3.625% CompuCredit's Notes were outstanding. (Order at 2.) During 2010 and the first quarter of 2011 CompuCredit purchased approximately $100 million of the Notes.[7] (Ex. 4 at 63.) Thus, as of March 2011, CompuCredit acknowledges having $132.5 million 3.625% Notes outstanding. (*Id.* at 63.)

---

[6] Because the MEM sale would net CompuCredit $135.9 million after taxes, presumably CompuCredit will retain $30.9 million of the sale proceeds after the $105 million Tender Offer.
[7] Noteholders allege that CompuCredit bought these Notes after artificially suppressing their value and thereby profited unfairly at Noteholders' expense. (*See* Order at 5-6, 26.)

In May 2012, the 3.625% Notes are redeemable at par.  CompuCredit will be unable to repay these when due.  If the proposed Tender Offer occurs, there would be a cash shortfall of $32.7 million to be made up over the coming year.  Because CompuCredit is liquidating, however, it cannot feasibly generate such cash. (McDonough Decl., Ex. B at 6-10.)

Regardless, in all likelihood, the Company will be out of business by then. The MEM sale and proposed Tender Offer will leave CompuCredit with only $21.57 million in equity.  If equity erodes at the same average quarterly rate as in 2010, CompuCredit will be insolvent by the end of this quarter, and its negative equity will worsen by $28.55 million with each successive quarter. (McDonough Decl., Ex. B at 2, Table 2.)

If the Tender Offer occurred, CompuCredit would not presently have the cash on hand to pay the 2012 noteholders.  (McDonough Decl., Ex. B at 8-9.) CompuCredit implicitly acknowledges the projected cash shortfall by disclosing its intention to bridge the gap with alternative financing:

> In addition to any cash or other assets we have on hand at such time to satisfy these potential conversions, we ultimately may rely on debt or equity issuances or possible exchange offerings, none of which are assured, to satisfy them.

(Ex. 4 at 63.)  But the notion that CompuCredit could turn to alternative financing to pay off its 3.625% Noteholders in 2012 is belied by other disclosures in its Form 10-K that no such financing is available to it.  (Ex. 4 at 21, 61.)

The inability of CompuCredit to meet its 2012 obligations to the 3.625%
Noteholders is immediate and palpable.   But the proposed Tender Offer is just as
harmful to the holders of $140.4 million of 5.875% Notes currently outstanding.
(Ex. 4 at F-41.)   The proposal demonstrates Defendants' intentional efforts to
elevate insider management's equity interests in CompuCredit above the rights of
creditors.  It is merely the latest and largest in "a series of events that demonstrate
CompuCredit's actual intent to defraud its creditors."  (Order at 34.)  Defendants'
misconduct is designed to hinder or defraud Plaintiff Noteholders and to profit by
the self-dealing.  (*See* Order at 26, 34-35.)

## ARGUMENT

Federal Rule of Civil Procedure 65 empowers this Court with the discretion
to grant Noteholders' motion and to enter a preliminary injunction prohibiting
CompuCredit's proposed Tender Offer.   To obtain a preliminary injunction,
Noteholders must demonstrate "(1) a substantial likelihood of success on the
merits; (2) that irreparable injury will be suffered unless the injunction is issued;
(3) the threatened injury to the moving party outweighs whatever damage the
proposed injunction might cause the non-moving party; and (4) if issued, the
injunction would not be adverse to the public interest." *BellSouth Telecomm., Inc.
v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir.
2005).  The Court's decision to grant a preliminary injunction will only be reversed

upon a finding of clear abuse of discretion.  *Id.*  Here, a balanced review of the four factors compels enjoining the Tender Offer.

The chief function of a preliminary injunction is to preserve the status quo between the parties.  *SunTrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001).  The status quo will be preserved only by enjoining the Tender Offer which will have the effect of retaining cash and equity in the ailing Company.  Conversely, the status quo will be irreversibly upset if CompuCredit is allowed to give away $105 million to departing shareholders at the expense of creditors, leaving the Company teetering on insolvency.

A recent decision by the Georgia Supreme Court is particularly instructive. In *Bishop v. Patton*, --- S.E.2d ---, 2011 WL 680197 (Ga. Feb. 28, 2011), the Georgia Supreme Court affirmed an interlocutory injunction under the Georgia UFTA freezing cash that could have been used to satisfy a pending tort claim but had been taken from joint bank accounts by the tortfeasor's son under suspicious circumstances.  Applying a preliminary injunction standard similar to federal law, the Court noted that fraudulent transfer cases are "especially amenable" to preliminary injunctive relief.   2011 WL 680197, at *5.  The Court further noted that the Georgia UFTA "specifically authorizes injunctive relief against further disposition of assets or other property that may be needed to satisfy a claim."  *Id.*

Because "[t]he key issue … under the Georgia UFTA is the transferor's

11

actual intent to defraud at the time of the transfer" and "[t]he trial court could infer from the many badges of fraud reflected in the circumstances of this case that the joint bank accounts were closed with the actual intent to hinder, delay, or defraud" creditors, the trial court's interlocutory injunction freezing the bank account proceeds was affirmed. *Id.* at *6-*8. Notably, the Georgia Supreme Court construed the UFTA to permit the asset freeze based solely upon a showing of fraudulent intent. Indeed, "[t]he fact that the alleged fraudulent transfer did not leave the defendant absolutely penniless [was] insufficient to defeat an interlocutory injunction." *Id.* at *11.

Fairly viewed in context with Defendants' previous acts, the proposed Tender Offer strengthens the inference of actual intent to hinder, delay, or defraud Noteholders. The $105 million give-away is much larger than CompuCredit's two previous shareholder enhancements and comes when the Company's finances are much worse. Based on a finding of actual fraud, an injunction under Georgia's UFTA is appropriate to preserve the status quo and prevent further damage.

Furthermore, the facts establish constructive fraud unequivocally. The proposed giveaway either renders CompuCredit insolvent imminently or leaves it with too few assets to carry on. Thus, two separate reasons mandate enjoining the Tender Offer.

12

## I.    <u>Plaintiffs Are Likely To Succeed On The Merits</u>

For an injunction to issue, Plaintiffs must first show a substantial likelihood of success on the merits of their underlying claim. *BellSouth*, 425 F.3d at 968. The Court "need not find that the evidence positively guarantees a final verdict in [Plaintiffs'] favor" in order to find a substantial likelihood of success. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). Here, publicly available information, nearly all of it from CompuCredit itself, demonstrates that Plaintiffs' fraudulent transfer claims are likely to succeed on the merits.

### A.    CompuCredit's Transfers, Including the Tender Offer, Are Intended to Hinder, Delay, or Defraud the Company's Creditors.

Section 4 of the UFTA describes two types of fraudulent transfers: those made "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor," O.C.G.A. § 18-2-74(a)(1), and those made under certain conditions regardless of intent ("constructively fraudulent" transfers). The Tender Offer is a fraudulent transfer under both tests.

Because intent to defraud is rarely admitted openly, "actual intent to hinder, delay, or defraud creditors is seldom susceptible to direct proof." *Bishop*, 2011 WL 690197, at \*6. Thus, to determine whether a transfer was made with actual intent to hinder, delay, or defraud creditors, courts consider a number of "badges of fraud." *Id.* at \*6-\*7. The UFTA lists eleven such badges, including whether the

13

"transfer or obligation was to an insider," whether the "value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred," and whether the "debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred."   O.C.G.A. § 18-2-74(b).

As this Court has noted, "[c]ourts have not delineated a single formula to show intent through badges of fraud; instead, it is a case by case determination, and fraudulent intent may be inferred from the totality of the circumstances." (Order at 33-34); *see Brandon v. Anesthesia & Pain Mgmt., Assoc., Ltd.*, 419 F.3d 594, 599-600 (7th Cir. 2005); *accord Bishop*, 2011 WL 690197, at *7 (Badges of fraud "are treated as relevant evidence as to the debtor's actual intent, from which the finder of fact may draw an inference of actual intent to defraud.") (internal quotations omitted).  When a debtor has engaged in a pattern of transfers, the Court must take into account the entire pattern in determining whether the debtor has the intent to hinder, delay, or defraud its creditors.  *See General Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1500-01 (11th Cir. 1997).

In this case, there is a clear pattern of action by CompuCredit to hinder and defraud the Noteholders.  The Court previously considered CompuCredit's $24 million "dividend" paid to shareholders in December 2009, its announcement of the proposed PFH spinoff in November 2009, and its coercive tender offer of April

14

14, 2010, which netted $85,264,230 to shareholders.  (Order at 5-6, 31-32; Ex. 2.)

The instant $105 million Tender Offer is simply the latest, largest, and most brazen

attempt to strip assets from the company for the benefit of shareholders and to the

detriment of Noteholders and other creditors.  This clear pattern is supported by a

number of badges of fraud.

*First*, each of the transfers is unquestionably for the benefit of the

shareholders of CompuCredit, primarily composed of corporate insiders, and at the

expense of CompuCredit's creditors.  The Company does not pretend that the

tender Offer is for any legitimate business purpose other than enriching its

shareholders, stating that "[t]he purpose of the Offer is to return capital to

shareholders."  (Ex. 6 at 10.)  This attempt to reverse the ordinary preference for

creditors over shareholders is contrary to Georgia law.  *See Willson v. Appalachian*

*Oak Flooring & Hardware Co.*, 140 S.E.2d 830, 836 (Ga. 1965) ("A stockholder

cannot sell his stock to the corporation and take therefrom his portion of the capital

stock to the prejudice of the corporation's creditors.").  Moreover, the fact that

these transfers are going to corporate insiders is "one of the most important

indicators of fraud."  (Order at 37.)

*Second*, CompuCredit is not receiving reasonably equivalent value in return

for its series of transfers.  The Company received no consideration for the $24

million cash distribution or for the $85,264,230 purchase of shares in the coercive

2010 tender offer.  Similarly, the instant tender offer does not confer any tangible benefit on the Company.  The planned stock purchase at $8 per share does not provide CompuCredit with reasonably equivalent value, or indeed *any* value.  (McDonough Decl., Ex. B at 3-4, 10.)  In fact,

> [a] transaction by which a company acquires its own stock from a shareholder for a sum of money is not really a sale.  The corporation does not acquire anything of value equivalent to the depletion of its assets, if the stock is held in the treasury, as in this case.  It is simply a method of distributing a proportion of assets to the stockholder.  The assets of a corporation are the common pledge of its creditors, and stockholders are not entitled to receive any part of them until creditors are paid in full.

*In re Corporate Jet Aviation, Inc.*, 45 B.R. 629, 634 (Bankr. N.D. Ga. 1985) (quoting *Robinson v. Wangemann*, 75 F.2d 756, 757 (5th Cir. 1935)) (emphasis omitted).

   *Third*, the pattern of transfers departs radically from CompuCredit's prior stated policies of preserving capital and not paying dividends, as well as reasonably acceptable business practices.  A rationally managed company operating in good faith in CompuCredit's position would not be giving away cash and assets to its shareholders.  Instead, CompuCredit's actions can only be understood as a transparent attempt to improperly return capital to shareholders at the expense of creditors.  *See In re Corporate Jet Aviation, Inc.*, 45 B.R. at 634.

*Fourth*, CompuCredit has stated its intent to "evaluate and pursue additional opportunities to repurchase our convertible senior notes … at discounts to face amounts." (Ex. 7 at 32.) It is apparent from CompuCredit's pattern of transfers that the "additional opportunities" it is pursuing to repurchase the Notes involve threatening to leave the Company with insufficient assets to pay off the Notes unless the Noteholders accept CompuCredit's punitive terms.

*Fifth*, CompuCredit is in dire financial straits. The Company acknowledges that it is in an acute liquidity crisis with no end in sight. (Ex. 4 at 21, 61.) Its equity is evaporating, and it is on the brink of insolvency. (McDonough Decl. at ¶ 12; *id.*, Ex. B at 1-2, 7-10.) Based on CompuCredit's trajectory, if it carries out its planned series of transactions, it would likely be insolvent as of the end of the first quarter of 2011. (*Id.* at ¶ 12; *id.*, Ex. B at 1, 10.)

The Georgia Supreme Court in *Bishop* held that a showing of five badges of fraud (including that the transfer was part of a suspicious pattern, it went to an insider, and was not in exchange for reasonably equivalent value) was sufficient to support an inference of fraudulent intent. 2011 WL 680197, at *7-*8. Similarly, courts routinely infer intent to hinder or defraud creditors when a financially distressed debtor makes a transfer for the benefit of insiders that is outside the normal course of business and accompanied by other suspicious activity. *See, e.g.*, *Kent v. White*, 279 Ga. App. 563, 565, 631 S.E.2d 782, 784 (2006); *see also*

17

*Freeland v. Edonis Corp.*, 540 F.3d 721, 733-36 (7th Cir. 2008); *In re Sherman*, 67 F.3d 1348, 1353-55 (8th Cir. 1995); *United States v. Denlinger*, 982 F.2d 233, 236 (7th Cir. 1992); *In re Computer Personalities Sys., Inc.*, 362 B.R. 669, 674-77 (Bankr. E.D. Pa. 2006); *Tolle v. Fenley*, 132 P.3d 63, 69-70 (Utah Ct. App. 2006). "While a single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance … several of them when considered together may afford a basis to infer fraud." *General Trading*, 119 F.3d at 1498-99.

In this instance, the confluence of suspicious factors creates a strong inference that CompuCredit is acting to "hinder, delay or defraud" its creditors by enriching its insiders to the creditors' detriment.  Its actions therefore violate the "actual intent" section of the UFTA, O.C.G.A. § 18-2-74(a)(1), and this Court should enjoin its latest tender offer to prevent further harm.  *See Bishop*, 2011 WL 680197, at *5-*8.

**B.    CompuCredit's Previous Transfers, Including the Tender Offer, Are Constructively Fraudulent.**

Even if no actual intent to hinder, delay or defraud creditors is shown, the UFTA also prohibits certain transfers as constructively fraudulent.  If a transfer is made without receiving "reasonably equivalent value" in exchange, it is prohibited when:

- the debtor "engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," O.C.G.A. § 18-2-74(a)(2);

- the debtor "[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due," *id.*; or

- "the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer," O.C.G.A. § 18-2-75(a).

As set forth more fully above, the announced tender offer is a transfer of cash to insiders with no reasonably equivalent value returning to the Company, as the stock the Company would purchase has no meaningful value from the Company's perspective. (McDonough Decl., Ex. B at 3-4, 10.) Further, it will leave CompuCredit with unreasonably small assets ($21.6 million) in relation to the remaining enterprise ($810 million in debt). (McDonough Decl., Ex. B at 1-4, 8-10.) Indeed it will likely render CompuCredit insolvent imminently. (McDonough Decl., Ex. B at 1-2, 9-10.) Therefore, the proposed transaction is a constructive fraud which must be enjoined.

It is black-letter law that a "corporation holds its assets in trust for the benefit of the corporation's creditors, and cannot lawfully distribute its assets to

shareholders to the prejudice of those creditors." *In re Trace Int'l Holdings, Inc.*, 289 B.R. 548, 560 (Bankr. S.D.N.Y. 2003); *see also Corporate Jet Aviation*, 45 B.R. at 634.  This prohibition "prevents an insolvent corporation from contracting to pay a dividend or redeem stock." *Trace*, 289 B.R. at 560; *see also Willson*, 140 S.E.2d at 836.  But even in situations short of GAAP insolvency, a transfer to shareholders without reasonably equivalent value is fraudulent if it leaves the company with insufficient resources to carry on its business or renders the company unable to pay its debts as they become due. *See, e.g., Moody v. Security Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992) (unreasonably small capital encompasses financial difficulties short of equitable insolvency but likely to lead to insolvency); *Barrett v. Con'l Ill. Nat. Bank & Trust Co.*, 882 F.2d 1, 10 (1st Cir. 1989) (critical inquiry in determining insufficient capital is to weigh raw financial data against the nature of the enterprise and extent of the enterprise's need for capital during the period in question); *see also In re Day Corp.*, 126 B.R. 370, 407 (Bankr. D. Mass. 1991) ("unreasonably small capitalization need not be so extreme a condition of financial debility as to constitute equitable insolvency"); *United States v. 58th Street Plaza Theatre, Inc.*, 287 F. Supp. 475, 478 (S.D.N.Y. 1968) (because certain tax claims *sub judice* could turn out to be valid, court voided a transfer that would have left the debtor with insufficient funds to pay those claims if they were approved).

Here, the publicly available evidence amply establishes that CompuCredit is a distressed, deteriorating, and liquidating company, on the brink of insolvency. As a result, the Tender Offer is a constructively fraudulent transfer under O.C.G.A. §§ 18-2-74(a)(2) and 18-2-75(a).

## II.   <u>Plaintiffs Will Suffer Irreparable Injury If the Tender Offer Is Completed</u>

Following a showing that it is likely to prevail on the merits, a movant for preliminary injunctive relief must demonstrate that the failure to issue an injunction will cause it irreparable harm. *BellSouth*, 425 F.3d at 968. An injury is "irreparable" whenever it cannot be "undone through monetary remedies." *Ferrero v. Associated Mats. Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991).

If the Tender Offer proceeds, a company that already has a mountain of debt relative to its equity, not to mention annual losses far in excess of either one, will further cripple its ability to pay its debts, to the tune of up to $100 million. As a result, the Noteholders are likely to suffer irreparable injury and will have no adequate remedy at law. Absent a preliminary injunction barring this illegal and coercive tender offer, there is a strong likelihood that by the time of final judgment and by the time the Notes are due, CompuCredit will lack the funds necessary to satisfy its obligations to the Noteholders. In such an event, an award of damages to the Noteholders will be meaningless.

Courts routinely hold that the threat of insolvency and the possible inability to collect on an eventual money judgment is sufficient to enjoin an alleged fraudulent transfer. For instance, in *Mitsubishi Power Systems Americas, Inc. v. Babcock & Brown Infrastructure Group US, LLC*, C.A. No. 4499-VCL, 2009 WL 1199588 (Del. Ch. April 24, 2009), the court granted Mitsubishi's motion for a temporary restraining order enjoining Babcock from fraudulently transferring its assets. Mitsubishi – a creditor of Babcock – asked the court to enjoin Babcock from selling any of its assets after Babcock's financial fortunes deteriorated and it was unable to pay Mitsubishi for various wind turbines that it had purchased. The court held that the "threat of a fraudulent transfer will constitute irreparable harm warranting injunctive relief." *Id.* at *8. Mitsubishi made a "colorable argument" that Babcock's debts likely exceeded its assets, thereby making it insolvent. *Id.* Mitsubishi's inability to collect on any judgment constituted irreparable injury and entitled it to injunctive relief from any future fraudulent transfers. *Id.*

This conclusion is supported by case law throughout the country. *See, e.g.*, *Southern New England Tel. Co. v. Global Naps, Inc.*, 595 F. Supp. 2d 155, 159 (D. Mass. 2009) (creditor would suffer irreparable harm if debtor were allowed to freely transfer assets between numerous companies to frustrate efforts of creditor); *LaRosa v. Pecora*, 2009 WL 1152013, at *6 (N.D. W. Va. Apr. 29, 2009) (judgment creditors would be irreparably harmed if defendant debtors were not

enjoined from transferring property outside the ordinary course of business, because without a TRO there would be nothing left to collect); *Star Ins. Co. v. Risk Mktg. Group, Inc.*, 507 F. Supp. 2d 942, 946 (N.D. Ill. 2007) (granting injunction and finding irreparable harm; "[i]f defendants' existing assets are transferred or otherwise dissipated such that defendants become further insolvent, plaintiffs will be unable to recover their judgment from defendants"); *Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F. Supp. 2d 341, 346 (N.D.N.Y. 2001) (granting judgment creditor's motion for injunction and finding irreparable harm where debtor sought to frustrate the efforts of a creditor by fraudulently conveying its assets outside the creditors' reach); *Oxford Homes, Inc. v. Royal Bus., Inc.*, 180 B.R. 1, 12 (D. Me. 1995) (finding irreparable harm where creditors' chances of meaningful recovery will be diminished or eliminated if alleged fraudulent transfer is not enjoined); *Star Creations Inv. Co., Ltd. v. Alan Amron Dev., Inc.*, 1995 WL 495126, at *7 (E.D. Pa. Aug. 18, 1995) (enjoining debtor from shedding assets and finding creditors would be irreparable harmed because, absent a TRO, they "will be forced to chase those assets through lawsuit after lawsuit").

## III.   The Balance of Harm Favors Granting Plaintiffs' Motion for Preliminary Injunction

The balance of hardships is the third factor, *BellSouth*, 425 F.3d at 968, and it tips decidedly in favor of Plaintiffs.  CompuCredit will suffer no meaningful harm if the Court issues an injunction.  Instead, CompuCredit will merely be

prevented from enriching its shareholders at the expense of creditors by purchasing its own stock at above-market prices, which confers no meaningful benefit on the Company.  The current end-date for the Tender Offer, April 11, 2011, is merely an arbitrary date set by CompuCredit, and there is no true harm that will occur to CompuCredit if the Tender Offer is postponed pending a hearing on a permanent injunction.  Finally, any harm CompuCredit now alleges is of its own doing, as this Court warned it repeatedly and unequivocally at the prior injunction hearing that any further action would be scrutinized and if it continued to strip assets for the benefit of shareholders, it did so at its own peril.

## IV.   <u>A Preliminary Injunction Would Serve the Public Interest</u>

The fourth and final consideration is whether the injunction would harm the public interest.  *BellSouth*, 425 F.3d at 968.  Far from being harmed, the public interest favors a preliminary injunction here.  No public interest is served by allowing a near-insolvent company to funnel its assets to insiders and frustrate the rights of public holders of its debt.  On the contrary, the UFTA reflects a strong public policy against precisely such activity.  Furthermore, the public interest is served by an injunction that protects creditors, who are not limited to Plaintiffs here, until the Court has an opportunity to rule on the merits of Plaintiffs' claims.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for a preliminary injunction, together with such other relief as the Court deems just and proper.

Dated:        March 23, 2011        Respectfully submitted,

ARNALL GOLDEN GREGORY LLP

Karen B. Bragman (Georgia Bar No. 075755)
Kevin B. Getzendanner (Georgia Bar No. 292425)
Heather Smith Michael (Georgia Bar No. 658625)
171 17th Street, N.W., Suite 2100
Atlanta, Georgia 30363-1031
Telephone: (404) 873-8654
Facsimile: (404) 873-8655

ROSS & ORENSTEIN, LLC

_____/s/ Harry N. Niska_____
Jeff I. Ross (#0144782 MN)
John Orenstein (#020903x MN)
Harry N. Niska (#0391325 MN)
(admitted pro hac vice)
222 South Ninth Street, Suite 470
Minneapolis, MN 55402
Telephone: (612) 436-9801
Facsimile: (612) 436-9819
**Counsel for Plaintiffs**

## CERTIFICATE OF COMPLIANCE

By his signature above, and as required by Local Rule 7.1.D, counsel for Plaintiffs certifies that this document has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1B, namely, Times New Roman (14 point).

CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**, with the Clerk of Court using CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

James David Dantzler, Jr., david.dantzler@troutmansanders.com
J. Timothy Mast, tim.mast@troutmansanders.com
Thomas B. Bosch, tom.bosch@troutmandsanders.com

Janna Satz Nugent, nugentj@gtlaw.com
Michael James King, kingm@gtlaw.com

Jeffrey O. Bramlett, bramlett@bmelaw.com
John H. Rains IV, rains@bmelaw.com
Naveen Ramachandrappa, ramachandrappa@bmelaw.com

This the 23rd day of March 2011.

/s/  Harry N. Niska
Harry N. Niska
(#0391325 MN)